## SULLIVAN, et al. v NORTHWEST FLORIDA WATER MANAGEMENT DISTRICT and DEPARTMENT OF ENVIRONMENTAL REGULATION and DRAINVILLE v NORTHWEST FLORIDA WATER MANAGEMENT DISTRICT AND DEPARTMENT OF ENVIRONMENTAL REGULATION

Case Nos. 84-4468 and 85-0129

State of Florida, Division of Administrative Hearings

August 31, 1987

### APPEARANCES OF COUNSEL

**Alvin L. Peters, Carroll L. McCauley, P.A.,** for petitioners and petitioning intervenors.

**Gary J. Anton** and **Steven K. Hall, Stowell, Anton & Kraemer, P.A.,** for respondent, Northwest Florida Water Management District.

**Douglas M. Wyckoff** for respondent, Department of Environmental Regulation.

**Suzi Ruhl** for intervenor, Chipola Basin Protective Group.

**J. David House** for intervenor, Board of County Commissioners of Calhoun County.

## OPINION OF THE COURT

ROBERT T. BENTON, II, Hearing Officer.

### RECOMMENDED ORDER

This matter came on for hearing in Panama City, Florida, before Robert T. Benton, II, Hearing Officer of the Division of Administrative Hearings, on April 13, 1987. On April 17, 1987, the fifth and final day, the hearing convened in Blountstown, Florida, as an accommodation for certain witnesses. The parties filed proposed recommended orders on May 22, 26 and 27, 1987. The attached appendix addresses proposed findings of fact by number.

As required by Chapter 84-380, Laws of Florida (1984), the Northwest Florida Water Management District (NWFWMD) made application to the Department of Environmental Regulation (DER) for a permit to remove the Dead Lakes Dam. In response to DER's notice of intent to issue the permit, DER's Exhibit No. 1, petitioners initiated formal administrative proceedings. In accordance with Section 120.57(1)(b)3., Florida Statutes (1986 Supp.), DER transmitted the matter to the Division of Administrative Hearings.

The hearing officer before whom the matter was then pending entered a recommended order of dismissal, on grounds that the injury which petitioners claimed removal of the dam would inflict had already been accomplished, by what then seemed to be the more or less permanent opening of gates in a drawdown structure adjacent to the dam. DER's final order rejected the hearing officer's conclusion that the petitioners' claim was moot, but followed his recommendation of dismissal, ruling that "removal of the dam will not affect the petitioners' interest because they do not presently have access to navigable waters."

On appeal, the District Court of Appeal, First District reversed and remanded for an evidentiary hearing, with directions that "the hearing officer, and ultimately DER, in the event an inquiry into the zone of interest is deemed necessary upon consideration of the appellants asserted injury in fact, . . . access the appellants' claim in the context of the appropriate statutory scheme." *Sullivan v. Northwest Florida Water Management District,* 490 So.2d 140, 142 (Fla. 1st DCA 1986).

### ISSUES

Whether petitioners and intervening petitioners, or any of them, have

133

standing or party status because removal of the dam would case injury in fact of sufficient immediacy of a kind within the zone of interests protected by Section 403.91 *et seq.*, Florida Statutes (1985)? If so, whether NWFWMD's permit application conforms to the requirements that Section 403.918, Florida Statutes (1985), Chapter 17-12, Florida Administrative Code, and Rules 17-3.001, 17-3.121, 17-4.242 and 17-4.290(5) and (6), Florida Administrative Code, set out? Whether NWFWMD has given reasonable assurances that removal of the dam would not cause water quality violations by lowering dissolved oxygen concentrations below allowable levels, or by causing eutrophication or turbidity or an increase in heavy metals, including chromium or other battery constituents, in excess of allowable levels? Whether removal of the damn would be in the public interest, taking into account the diversity of aquatic life, including aquatic weeds, and whether fish spawning will be enhanced or hindered, whether heavy metals would . reach Apalachicola Bay and affect oyster beds or marine productivity, what effects on the property of others would be, what the effects would be on fishing and other recreation, public safety for canoers and others, navigation generally, mosquito breeding and odors?

## FINDINGS OF FACT

The Dead Lakes are a wide place in the Chipola River. Near Wewahitchka, a forest of towering cypress trees once flourished in the periodic inundation of the Chipola River. But when a sinkhole collapsed the river banks, widening the Chipola River and the lower reaches of Stone Mill Creek, a tributary, to form the Dead Lakes, the trees growing in the riverbed also sank. Permanent immersion eventually killed many of the trees. The dead, moss-draped remnant the loggers left inspired the name of the lakes, which stretch for some ten miles through Gulf and Calhoun Counties.

### The Rise and Fall of the Dead Lakes

The level of the Dead Lakes depends not only on how much water flows in, but also on how much flows out. Before man's intervention, the rate of outflow depended all year round on the stage or height of the Chipola Cutoff, the fork of the Apalachicola River into which, just below the Dead Lakes, the Chipola River drains, as well as on the stage or height of the Chipola River above the Dead Lakes. When the Apalachicola River and, therefore, the Chipola Cutoff were high, a backwater or damming effect tended to keep the level of the Dead Lakes up. Although pristine conditions no longer obtain, the relative elevations of the Chipola and Apalachicola Rivers still affect the water level in the Dead Lakes, at certain stages.

134

The Chipola River drains approximately 1,280 square miles in northwest Florida and southeast Alabama. Alhough the Chipola is spring fed, the flow of water into the Dead Lakes depends ultimately on rainfall in the basin, which varies seasonally. At Altha, the lowest flow every recorded was 330 cubic feet per second, and the highest flow on record there was 25,000 cubic feet per second.

The Apalachicola River, which arises out of the confluence of the Flint and Chattahoochee Rivers, drains a much larger area. Its flow has been altered by the Jim Woodruff Dam and other dams further north that the Army Corps of Engineers constructed, and now uses to generate electricity, and in an effort to keep at least nine feet of water in the Apalachicola River channel, for the benefit of commercial traffic. Although intended to bolster low flows, the Jim Woodruff Dam was first used to impound a reservoir, Lake Seminole, for the purpose. In combination with dry conditions, the result was record low water levels in the Dead Lakes of about ten feet NGVD during the years 1954 through 1958.

### Lakes Dammed

Alarmed at this change in the Dead Lakes, people in the area decided a dam should be built. Not one of the 88 owners of property on the lake objected. The Legislature created the Dead Lakes Water Management District (DLWMD), Chapter 57-1115, Laws of Florida (1957); and the DLWMD constructed a stop log, low head weir just below and parallel to the bridge on which State Road 22A crosses the water flowing out of the lakes. The 787-foot weir was completed in late 1959 and early 1960 on the right of way of the St. Joseph and Iola Railway, alongside the bridge, not far upriver from the point where the clear water leaving the Dead Lakes joins the muddy waters of the Chipola Cutoff. The weir was designed to maintain the Dead Lakes at elevations up to 18.2 feet, in times of low flow. The stop log feature allowed adjustments so that elevations of less than 18.2 feet could also be maintained.

In 1962, the stop log portion of the weir gave way, and that part of the weir was reconstructed, as the remainder had originally been constructed, with interlocking sheet pile, which, braced and buttressed with I-beams, did not allow any drawdown of the lakes below 18.2 feet NGVD. No work has been done on the dam since 1962, and experts predict it will fail in about ten years if not attended to.

The DLWMD installed four culverts about seven or eight feet high and twelve feet wide to the west of the weir in 1974, in order to restore

drawdown capability, as a means of controlling aquatic weeds. The DLWMD caused a channel to be excavated to these culverts, which were equipped with gates that could be raised and lowered with a screw mechanism. Although the invert elevation of the culverts is 10.5 at the upriver end and 10.3 feet at the other end, the Dead Lakes can only be drawn down to about 14 feet because of "base flow" and because of the configuration of the bottom, upriver of the culverts. With the gates of the drawdown structure closed, the height of the weir (18.2 feet NGVD) is the limiting factor.

## Effect of Removal

For about one-fifth of the year neither the weir nor the drawdown structure determines how high the water in the Dead Lakes is, because interaction between flows in the Chipola River and in the Chipola Cutoff, the fork of the Apalachicola River which eventually rejoins the main river channel, keeps the Dead Lakes at or above the weir crest. During this part of the year, usually beginning in December and ending in March, Respondent's Exhibit No. 2, p. 20, the absence of the dam that MWFWMD seeks a permit to remove would make no difference.

But, during times of low flow, with the dam out, the water level in the lakes would fall well below the current floor. Only one percent of the year, however, on average, would the lakes fall as low as the levels they reached in the 1954 to 1958 period. Eighty-five percent of the time the water level would be at or about 12 feet NGVD, without the dam, and the median elevation would be 14.75 feet NGVD, less than a foot above the lowest levels now reached. Without the dam, the lakes would cover more than 3,660 acres, the area covered at 14 feet NGVD, for half the year. The Dead Lakes now cover at least 5,500 acres half the time, or did before the drawdown gates began staying open.

## No Control Over Control Gates

As of the last day of the hearing, the testimony was that two of the drawdown gates were open and two were closed. For some months preceding the hearing, private citizens opened and closed the gates willy nilly, although it was a good deal easier to close them than to open them, because they are quite heavy and the screw mechanisms are broken.

With the dam's transfer to the NWFWMD for the purpose of seeking the permit here in contention, the DLWMD has become defunct, de facto it not de jure. According to Forest Revell, however, as quoted by Sheriff Harrison, the last word frm the DLWMD on the gates was an order that they remain open.

136

They were locked opened in May of 1986 when Edward Bailey, 67 years of age, found himself unable to start his outboard motor as he drifted north of the drawdown structure in a small boat with his wife. The current dragged them through a culvert. Mrs. Bailey survived, but her husband did not. Charles Alford Gaskins had been sucked through a culvert some time before Mr. Edwards' fatal accident.

Sheriff Al Harrison closed the gates to protect the divers who retrieved Mr. Bailey's corpse, but later opened them in obedience to the DLWMD's reportedly final order on the subject, not without, however, bringing the matter to the attention of a former member of the DLWMD board, Mr. McCarty at the NWFWMD, and various other officials, including then Governor Graham. All disclaimed authority to order the gates closed, and nobody posted any warning. In order to close the gates to protect the divers, the sheriff found it necessary to cut the locks, which were not replaced when the gates were reopened. At the time of the hearing, whether the gates were open or closed was "up to the vandals."

*All In Favor*

Sponsored by James Harold Thompson, then Speaker of the House of Representatives, House Bill No. 1262 became law with the Governor's approval on June 19, 1984. Chapter 84-380, Laws of Florida (1984). After the enactment of Chapter 84-380, Laws of Florida (1984), NWFWMD began applying for the permits necessary to remove the Dead Lakes dam, including the dredge and fill permit at issue here. So far it has obtained the requisite permit from the Army Corps of Engineers and a permit from the NWFWMD itself. The Florida Department of Natural Resources has no objection to taking the dam out. Florida's Game and Fresh Water Fish Commission, the United States Department of Interior's Fish and Wildlife Service, and the United States Environmental Protection Agency also approve.

The Department of Environmental Regulation is the state environmental agency to which the NWFWMD has made the application for the permit at issue in these proceedings. As stated in its notice of intent, DER, which actively participated at the formal hearing, supports removal of the Dead Lakes Dam.

Also favoring removal of the dam is the Board of Commissioners of Calhoun County, which participated in the formal administrative proceeding as an intervenor. On March 13, 1984, Calhoun County had a "straw vote" on whether the Dead Lakes Dam should be removed. Those in favor of removal prevailed, 1,575 to 276. The County

**137**

Commission endorsed removal by resolution on March 27, 1984, Respondent Intervenor's Exhibit No. 3, and subsequently voted to intervene in these proceedings in support of NWFWMD's application for a permit to remove the dam.

The voters of Gulf County also favored removal of the dam in a referendum held there. The vote was 1,550 for and 594 against. The Gulf County Commission, too, endorsed removal by adopting a resolution No. 84-7, Respondent's Exhibit No. 35, but Gulf County has not sought intervention in these proceedings. The same is true of the Cities of Marianna and Blountstown, whose City Councils have also passed resolutions in support of removal of the dam. Respondent Intervenor's Exhibits Nos. 4 and 5. Many of the owners of land on the Dead Lakes are not registered to vote in Gulf or Calhoun Counties, or in Marianna.

Also participating as a party in support of removal of the dam is the Chipola Basin Protective Group, a corporation not for profit organized in July of 1983 in an effort to conserve and preserve natural resources in and around the Chipola River. Some 100 people are members, including some who own land on the Dead Lakes and others who own property elsewhere on the Chipola River and "use these natural resources."

### All Opposed

Opposing the permit application are a number of property owners whose waterfront access to the Dead Lakes, although in times of low flow already impaired in many cases, would become still more difficult, if the water in the lakes dropped below the levels at which the dam now keeps it. The east side of the lakes are timberland in single ownership. On the west side, both permanent homes and weekend cottages have been built, and there are a number of fish camps and the like whose revenue depends on access to and fishing in the Dead Lakes.

Daniel Monroe Sullivan began fly fishing in the Dead Lakes in 1935 when he went off to the war, where he lost both knees. He "put everything [he] had" into the old Rowell landing, which he purchased in 1975, from Mr. Rowell, who since 1960 had let him keep a trailer on the property. The parcel has frontage on the Dead Lakes of 286 feet and is 394 feet deep. Improvements include a six-stall boathouse with handrails, and a floating dock. Mr. Sullivan has things arranged so that he can lower himself into a boat and set out, or could until people started opening the gates of the drawdown structure. Now, at low water, some 300 yards of mud separate the boathouse from the Dead Lakes. Mr. Sullivan's physical condition makes it impossible for him to

trailer a boat by himself and launch it from one of the three or four ramps where the water is always deep enough even with the gates open.

Just north of Mr. Sullivan, Tullis D. Easterling, who also first fished the Dead Lakes more than 50 years ago, owns two lots, comprising about an acre and a half, with 212 feet fronting the western shore of Dead Lakes. He has a mobile home, a cook shack and other improvements, including a shed for three boats and a 60 to 70 foot dock, which extended 40 feet out into the water, when it was built. With two of the drawdown gates closed, he can still use the dock, which is no small convenience for a man 77 years old. At low water, with the gates open, 300 yards of mud separate his dock, too, from the Dead Lakes.

From his property north of Mr. Easterling's place, Charles L. Nowlin was able to launch his boat by backing his trailer down a sort of ramp he fashioned with patio blocks. He has about 400 front feet, "when there's water," and a two bedroom cottage on the property. Usually the water is from 2 to 2.5 feet deep in the "natural slip" in which he keeps his boat, but in 1985 and again in 1986 the slip went completely dry at times. He had to launch his boat elsewhere and pole into a neighbor's dock.

Thomas C. Brock, a 64-year-old retiree, has a two-bedroom cottage on the Dead Lakes, and a 45-foot dock at the end of which the water was 4 to 4.5 feet deep at the time of the hearing. At low water, however, with all the drawdown gates open, "you can plant a turnip patch" in front of his place. Once the lakes attain a height of 15 feet, Mr. Brock can reach his dock by boat. An avid fisherman, Mr. Brock fishes on the Dead Lakes regularly, having first fished there in 1945.

James W. Quick and his wife live year round in a home on the Dead Lakes. Retired from the Air Force, he fishes continuously. At the time of the hearing, the water was 3.5 to 4 feet deep at the end of the Quicks' 80-foot pier, but last summer the pier was 300 yards from the water and you had to go another 100 yards into the water before it got knee deep.

Oscar G. Clark has owned the property next to the Quicks since 1951. He bought the place for the fishing, which has long been his main recreation. Fishing on the Dead Lakes is what he mainly does since his wife died. He has a ramp and space for four boats under a boat shed, and has no trouble using the ramp in high water, but the last two years in a row the water has been too low seven or eight months running.

James C. and Dorothy Taylor own a house on the west side of the

139

Dead Lakes, on the Chipola River channel. The water is 12 to 14 feet deep only some ten feet beyond the end of their dock, which extends 28 feet into the lake. The depth of the water at the end of the Taylors' dock ordinarily fluctuates between 2.5 and 4 feet, but three or four times since 1981, the water's edge has receded two feet beyond the end of the dock. The Taylors' neighbors on the channel, Messrs. Linton and Bidwell are in essentially the same situation.

Paris Wayne Carter, a Wewahitchka businessman, bought a place on the Dead Lakes two years ago, with a dock that ordinarily extends 25 feet out into the water, where the water is ordinarily two to five feet deep. But last year at low water with the gates open, he walked 300 yards from his boat dock to the water's edge.

James Carroll Stokes, who is totally and permanently disabled, sold his house and used the proceeds to buy six acres on the west arm of the Dead Lakes. He lives there now in a mobile home. He has 18 hookups on the property for recreational vehicles, and charges campers $8.00 a night. When the lakes are at 18 or 19 feet, the boat ramp he has is half out of the water, but at low water with the drawdown gates open the ramp cannot be used to launch boats, which affects his business adversely.

In 1980, the year Leland Taylor bought the Jerry Gates Fish Camp, business was pretty good. The fish camp consists of five cabins and a house on five acres with 1,200 feet on the lake, and has eight boats and six motors. Even at low water with the gates open, he can get from the end of his 300 foot pier, where he keeps two of the boats, to the middle of the Dead Lakes, but, under such conditions, the boat shed where most of the boats are kept is separated from the water by 200 feet. With the opening of the drawdown gates, business has slackened considerably. Mr. Taylor has had to telephone people planning to come to his camp to fish to tell them the water level would not allow it.

Juanita Dill put the Cypress Lodge up for sale over two years ago. The Cypress Lodge was once a thriving business. Gulf Life agents 40 to 50 strong used to come every year to go fishing, but business fell off sharply in the last few years, and Ms. Dill has closed the place down. The evidence did not establish that the decline in business was on account of problems with access to the lakes, as opposed to poorer fishing. But interrogatories adduced as evidence at hearing established that Ms. Dill, Max W. Kilbourn, Jim Gross, R. F. Martin, G. W. Hobbs, J. M. Whittaker, Lee Thompson, Duncan Smith, J. C. Blanton, C. D. Ramsey, Sr., Theodore Elchos, and V. E. Hilton, "have already suffered loss of their access to navigable water."

140

For 45 or 50 years, Clude Finch Brogdon has owned 165 acres with about three quarters of a mile fronting on the Dead Lakes. Mr. Brogdon raises sheep and cattle on the property. When the water recedes, the animals stray into the mud and bog down. He has to pull them out with a tractor and a length of line. Mr. Brogdon also has a boat ramp on his property that stops well short of the water when the lakes are down. Snails or something die and stink when the water recedes. For a day or two afterwards there is an expanse of "souring mud."

### Water Quality

The clear "fast flowing Chipola River slows and spreads to form the strangely beautiful Dead Lakes," Respondent's Exhibit No. 40, but remains relatively free of suspended solids both in the Dead Lakes and when the river narrows again near the dam, until its confluence with the muddy Chipola Cutoff. In the long run, removal of the dam would lessen turbidity below the dam by increasing the volume of clear water mixing with the Chipola Cutoff during periods of low flow. In the long run, removal of the dam would lessen turbidity even in times of high flow because it would virtually eliminate the erosion now occurring in the vicinity of the drawdown structure.

In the short run, removing the dam would occasion a temporary increase in turbidity. The plan is to station equipment on the bridge (instead of on a barge) to "vibrate out" the sheet piles and to remove the steel from the site, leaving the riprap on the bottom to damp turbidity and curtail the movement of sediment. If the vibration shears a sheet pile, however, the contractor will have to go one foot beneath the bottom and cut the pile there. Under a proposed special permit condition, the contractor will not start work until the water level upriver of the dam is within one foot of the water level downriver, in order to avoid a sudden rush of water. This will help keep turbidity down and is also important for the safety of the bridge.

### Dissolved Oxygen

In August of 1984, with flows low enough so that the Dead Lakes Dam had impounded the waters of the Dead Lakes, investigators took water samples from the Dead Lakes and from "the Chipola River above the influence of the dam." DER's Exhibit No. 8. Analysis of a sample taken from the bottom, at a point where the lake was nine feet deep, revealed 3.3 milligrams of dissolved oxygen per liter. A sample taken only one foot below the lake surface was not much better: 3.5 milligrams of dissolved oxygen per liter. By comparison, the upriver

141

samples yielded results of 7.0 milligrams of dissolved oxygen per liter, or higher. The samples demonstrate the negative net effect impoundment has on dissolved oxygen levels, even though impounded makes for more aquatic weeds, which add more dissolved oxygen to the water than they remove.

The Dead Lakes Dam is in part responsible for these depressed levels of dissolved oxygen in the summer months, and its removal would alleviate the situation. By slowing or stopping the flow of the Chipola River, the dam increases precipitation of organic sediments, which gather on the bottom and compete with living organisms for the limited amount of dissolved oxygen available. Not only would removal of the dam decrease precipitation by increasing the velocity of the flow, it would cause a greater expanse of lake bottom to be uncovered, permitting oxidation of sediments exposed to sunlight and air. As a consequence, when the water again covered the sediment, the sediment would require less dissolved oxygen.

### Eutrophication

Water hyacinths (Eichornia crassipes), limnophila (Limnophila sessiflora) and Brazilian elodea (Egenia densa), which are species of aquatic weeds not indigenous to Florida, all grow in the Dead Lakes, although they are under control and do not present a serious problem. Indeed, some vegetation, even of this kind, is advantageous.

Exotic aquatic weeds flourish at the expense of native species, however, and, in overabundance are detrimental to game fish. Herbicides have proven effective against them, except perhaps in the case of Brazilian elodea which, however, such fluctuations as now occur in the level of the lakes seem to keep in check.

The impounding effects of the Dead Lakes Dam create favorable conditions for the exotic, aquatic weeds' growth; the lakes tend to grow more shallow and weeds spread. The dam causes accumulation of the nitrates that enter the Chipola from agricultural operations upriver.

Without the dam, no abundance of aquatic weeds could persist. Periodic drawdowns or natural fluctuations are a good means of controlling most weed species. Water hyacinths, which can germinate in a drawdown, are the exception. With the dam removed, sedges and slender rushes would grow up quickly and, in 10 to 20 years, a cypress forest would reestablish itself closer to the river channel, shading the river. Not only cypress, but also willow and button bush would grow up and keep sunlight from aquatic weeds underneath.

142

## Heavy Metals

From 1970 until it went out of business in 1979, the Sapp Battery Company (Sapp) operated a battery salvage facility on the bank of Little Dry Creek, an intermittent tributary that empties into the Chipola several miles upriver of the Dead Lakes, north of Altha. While it operated, Sapp disposed of heavy metals, including lead, zinc, mercury and cadmium, improperly, so that these materials made their way into the Chipola River, caused at least one fish kill, and apparently caused the elevated levels of heavy metals found in the tissues of native mussels and corbicula alike. Finfish as well as mollusks exhibited these elevated levels at one time. Although several intervening ox bows or deep bends have been "deposition areas," there are no impoundments in the Chipola River between the Sapp site and the Dead Lakes.

In 1984, the U. S. Environmental Protection Agency secured the site of the battery salvage facility, and heavy metals have not entered the Chipa River from that source since. Any manganese still in the water may be geologic in origin. A gladiola farm nearby may contribute to mercury in the river by dipping bulbs in mercurial fungicides. Cadmium is found in phosphate fertilizer, and both manganese and zinc are also used in agriculture.

Heavy metals tend to bind to fine clay grains which precipitate out of the water and end up in the sediment and this seems to have happened in the Chipola River, including the Dead Lakes, where occasional sediment samples have revealed high concentrations of heavy metals. But the water itself is now free of measurable quantities of heavy metals. No heavy metals were detected in a sample of the water column taken on April 3, 1987, just above the Dead Lakes.

The evidence rules out the hypothesis that removal of the Dead Lakes Dam would let water contaminated with heavy metals escape into the Chipola Cutoff and ultimately into Apalachicola Bay, with its extensive oyster beds. The only conceivable mischief along these lines would be the transport downstream of contaminated sediment into a marine environment in which chemical reactions binding heavy metals would be altered or reversed, releasing them into the water.

But the weight of the evidence suggests that, for better or worse, contaminated sediments bound for a marine environment have probably already migrated downriver. In times of low flow, the dam slows or stops the river, percipitating all manner of suspended solids, including materials on the periphery which may never be resuspended or reach the estuary. On the other hand, accumulations of muck up to 12 inches deep in the river channel are regularly resuspended, as the water rises

**143**

above the weir crest and the current scours the channel bottom. In times of high flow, rocks, fine sand and shells lying on the upriver side of the Dead Lakes Dam are stripped clean of all organic sediment. The dam has not prevented the movement of large quantities of sediment downstream.

## Public Interest

Removing the Dead Lakes Dam would enhance the public safety. When the dam is underwater, as it is, on average, more than two months a year, it is a submerged barrier presenting a considerable hazard to the unwitting boater. Although the application does not contemplate removing the drawdown structure, removal of the dam would take away the incentive to open the drawdown gates. Even if the gates remained open, moreover, and the water was high enough to flow through the culverts, the absence of the dam would reduce the rate of flow through the drawdown structure and the attendant danger.

Apart from the matter of safety, the evidence did not show that removal of the dam would have any effect on the public health, although Sheriff Harrison did testify to parts of dead fish being strewn on the ground near the dam where fishermen gathered. Petitioners raised the possibility that the river would leave isolated pools of water as it receded, pools in which mosquitos might breed. But the weight of the credible testimony was that gambusi or other fish trapped in such pools would eat the mosquito larvae; and that the mosquito population should not increase, in the absence, at least, of some man-made interference with drainage.

## Andromadous Fish

On balance, taking the dam out should enhance the conservation of fish and wildlife, including endangered or threatened species, and their habitats. During spawning season, with the dam in place, fishermen gather on the downriver side of the Dead Lakes Dam and catch substantial numbers of roe-laden fish. They are "all bottled up trying to get in."

At one time, Alabama shad, striped bass and Gulf of Mexico sturgeon were found in the Dead Lakes and still further north in the Chipola River. During the summer months these andromadous fish seek a "thermal refuge" in cooler fresh water. Now only the Alabama shad swims north of the dam. Before the dam went in, striped bass occurred in fairly substantial numbers north of where the dam now is. Evidently they cannot navigate the dam now. Even when the water is well above the weir crest, certain species that swam upriver to spawn

144

before the dam was built no longer do so. Either they swim too close to the bottom, or they are unable to contend with currents through the drawdown structure and over the weir.

Beginning last century and as late as 1970, commercial fishermen took Gulf of Mexico sturgeon, some of which weighed as much as 350 pounds each. By 1983, the number of Gulf of Mexico sturgeon had dropped to 380 fish, and the number fell to 69 in 1986. Now the Gulf of Mexico sturgeon is in category two under the federal endangered species law. The Dead Lakes Dam closes off 80 miles of the Chipola River to this dwindling population. The temperatures in the Chipola River are more constant and the flows more stable than those in the Apalachicola River to which the sturgeon are now relegated. Only 17 percent of the open river system formerly available to the Gulf sturgeon is still accessible.

Removal of the dam may also increase the numbers and widen the distribution of the greyfin redhorse, the snail bullhead, the spotted bullhead and the dusky shiner. Respondent's Exhibit No. 27.

Fish who do reach the Dead Lakes to spawn come when the water is above the weir crest, and go to the shallow periphery to deposit their eggs. At such times, it is not the dam that determines the height and configuration of the Dead Lakes, and its removal would not interfere with this spawning. On the contrary, removal of the dam would help matters. During times of low flow, the dam slows or stops the water occasioning precipitation of soft organic material in the shallows. When spawning times comes, roe can sink into this material and fail to hatch for want of oxygen.

### Little Effect On Birds

Restoration of a more natural hydroperiod would let certain trees reestablish themselves in areas now covered year round, improving the habitat for nesting birds. Newly uncovered land would be seasonally available to deer, turkey and squirrel, but less hospitable for alligators and others. Aquatic organisms trapped in sloughs would become food for predators, like the wood stork. During periods of low flow, the black bear and the indigo snake would have additional foraging. The little blue heron, the snowy egret and the tri-colored heron might benefit from removal of the dam as might, theoretically, the limpkin, although there is no proof the limpkin is present in the area. If bald eagles are present, removal of the dam would work to their disadvantage, but no record exists of their nesting or making any other use of the area.

Thousands of ducks flocked to the Dead Lakes regularly as recently

as 1964 or 1965. Now perhaps a tenth that many come, mainly wood ducks and a few mallards. On the other hand, the number of ospreys has increased since the dam went in. This may in part be attributable to protection they have received under the game laws in recent years. For most birds and other air-breathing wildlife, removal of the dam would not have a significant effect one way or the other.

### Fish Stories

Fishing is the main recreational use to which the Dead Lakes are put. The short-term effect of impounding the Dead Lakes during times of low flow was an increase in the number of fish who multiplied or congregated to avail themselves of the newly prolonged enlargement of their aquatic habitat. Over time, however, other effects have become evident and taken their toll. If the numbers of fish have not fallen dramatically, their average size has. Diminished oxygen attributable to the impoundment has increased fish mortality by its direct effect on the fish, as well as indirectly by its effect on organisms further down the food chain. Hardest hit among the fish have been some of the most sought after: shellcracker, largemouth bass, blue gill and channel catfish, among others. Removing the dam would improve the fishing.

Fishing on the Dead Lakes was once almost too good to be true, to hear the oldtimers tell it. As late as 1959, there were 20 fish camps on the lake. Mr. Brock remembers seven "major" ones in the 1940s. Now six are open, if that. Sixty years ago, Sam Casey fished the whole summer, and for many summers after that, but now he doesn't bother after the willow fly season is over. Cyrus Royce Lewis also began fishing on the Dead Lakes in the 1920s, and now he, too, goes almost exclusively during late spring and early summer, when may flies and willow flies hatch. After that, it's no use, he finds.

Expert fishermen like Mr. Sullivan, Mr. Easterling, Mr. Brock, Mr. Quick, and Mr. Leland Taylor, who testified he caught a ten-pound bass last spring, still catch fish regularly, but the fishing is not what it once was. It is a lot harder to catch fish now, and some owners of property on the lakes, including Charles Cook Bridges, want to see the dam out so the fishing will improve. In the 1950s, you might see 200 boats tied to each other fishing over a five-acre shellcracker bed. The Game and Fresh Water Fish Commission roped off some of the beds to protect spawning fish; the game garden had to sleep in his boat to guard the beds. As late as 1964 there were single shellcracker beds that covered three acres of lake bottom. Now you only see "pocket beds," maybe half the size of the courtroom in the Calhoun County Courthouse.

146

The first time Alton Coxwell, now 55 years old, went fishing on the Dead Lakes was with his mother who put an umbrella over him. When, as a small child, he began getting bait for his uncle, his uncle sold all of it to people going fishing on the Dead Lakes. Before the Second World War, Willy Rowell alone had 300 boats but nobody had outboard motors to speak of. People fished with flies, or catawba worms and crickets then. Nowadays Mr. Coxwell sells lots of earthworms. He put retail sales of earthworms at 21,000 for Thursday the week of the hearing. But only two to five percent of these earthworms were used as bait in the Dead Lakes. Nineteen years ago, more than 20 percent of the earthworms Mr. Cox sold were used for bait in the Dead Lakes.

In 1977, the Bay County Bass Club had four tournaments on the Dead Lakes, but for the last two or three years they have held only one tournament a year on the Dead Lakes. They have considered not scheduling any more there. Two fishermen in each of 23 to 27 boats, all of whom are familiar with the Dead Lakes, participate in these tournaments. Jim Bozeman of Wewahitchka caught 14 pounds of bass in his first tournament in 1977, but did not finish in the top three. Last tournament the winner caught less than five pounds of bass. The biggest bass caught in a 1977 tournament on the Dead Lakes weighed 7 pounds 4 ounches. In last year's tournament on the Dead Lakes, the biggest fish weighed three pounds. The biggest bass (eight pounds) that Mr. James C. Taylo ever caught he took in July of 1978.

The Chipola River is more productive both above and below the Dead Lakes. Increased fishing pressure cannot account for the decline in numbers and the even more remarkable decline in the size of game fish in the lakes. Indeed, the weight of the credible evidence was that less fishing occurs on the Dead Lakes now than 10 or 20 years ago when the fishing was better. Since 1981, the number of permits sold for fishing on the Dead Lakes has declined.

The fisheries' biologists corroborated the testimony that, after an initial beneficial effect on the numbers and weight of fish in the Dead Lakes. Very likely the low dissolve oxygen levels in the summertime keep many fingerlings from surviving to grow larger. Mr. Leland Taylor's testimony that he has never seen mature fish floating dead on the lakes is consistent with the hypothesis that many do not survive the critical fingerling stage. Removal of the dam would increase fish production. While the volume of water in the Dead Lakes and therefore the fish habitat would shrink further in low flows than it does with the dam in place, the fish would have access to habitat downstream without having to contend with the dam.

## Invertebrates

Other aquatic life has waned with impoundment of the Dead Lakes, including snails of the kind that leave a white, snail-wide streak of eggs on trees growing at the water's edge. When they hatch, they fall into the water and become food for the shellcrackers, but their numbers have been declining since 1966.

The drought in 1955, which like last year's, was among the most severe the Chipola River has experienced, did not affect the diversity of aquatic life in the Dead Lakes adversely. In August of 1984, a sampling of benthic organisms, bloodworms and the like, in the Chipola River near State Road 71 above the Dead Lakes yielded 1,256 individuals comprising 33 species, with a Shannon-Weaver diversity index of 4.07. A sample taken at the same time in the Dead Lakes near the dam yielded 304 individuals representing only eleven species, and a Shannon-Weaver diversity index of 1.38. A contemporaneous sample taken downriver from the dam had a comparable Shannon-Weaver diversity index (2.41), although 18 species were present. Of 975 organisms in the downriver sample, 575 were tubificid worms, a species which does not contribute significantly to fish productivity.

Although less water during drier periods would mean less bottom area for benthic organisms, some of these organisms depend on periodic fluctuation. Even those that require constant immersion can survive, when the water level falls slowly enough for them to adjust. The loss of some organisms would not necessarily diminish the diversity of species.

Historically prolific throughout the Chipola River, native mussels are now found only in the upper reaches of the river. Removal of the dam would restore the environment in which they prospered before the impoundment. The impoundment has affected larger invertebrates adversely too. Dr. Nowlin testified he had not seen any crawfish lately. Higher dissolved oxygen in the lakes would increase the diversity of species of macro- and benthic invertebrates alike.

Mr. Stokes, Mr. Brogdon, Mr. Leland Taylor and others testified about the stench of souring mud that persisted for a day or two after each of the abrupt drawdowns which the erratic opening of the control gates occasion. As Mr. Brogdon testified, the odor arises because "something dies." Removal of the dam will bring an end to the sudden, random outrushing of impounded water through the drawdown structure. Without the dam, the water level will fall and fall further, but the drop will be more gradual so that organisms that need water to survive will have a chance to migrate and remain submerged. A more gradual

148

lowering would also mean that less bottom would be newly exposed in the same interval of time. For both these reasons, removal of the dam should make odors associated with changes in the level of the Dead Lakes less, not more, of a problem.

### Public Welfare And The Property Of Others

The Dead Lakes dam serves no flood control function. In times of low flow, it creates a reservoir, but the weight of the evidence was that such a reservoir is not needed. Nothing in the record suggests that removal of the dam would affect any significant historical or archaeological resources.

There are two public boat ramps on the Dead Lakes, one at Oak Grove in Calhoun County and one in the Dead Lakes Recreational Area. Removal of the dam would render both of them useless for much of the year, unless they were extended.

With the dam gone, fishermen and other recreational boaters would be able to navigate the Chipola River from a point in Jackson County down to its confluence with the Chipola Cutoff and from there down the Apalachicola River to Apalachicola Bay and the Gulf of Mexico, during much of the year. Boaters coming upriver could enter the Dead Lakes under a wider range of conditions. The dam, of which neither buoys nor anything else gives warning, presents a considerable navigational hazard. On the other hand, removal of the dam would impede navigation for riparian owners, who would need to extend their docks or boat ramps or take other measures to gain access to the water during times of low flow.

Bound up with the environmental effects of removing the dam are certain economic realities. The weight of the evidence established that the value of most of the private residences, permanent and others, along the west shore of the lakes, would tend to decrease with removal of the dam, because removal would aggravate the access problem most of these landowners now have. On the other hand, other environmental consequences of removing the dam, notably better fishing, will have a beneficial economic effect, tending to increase land values not only for riparian landowners but also for owners of other property in the area.

For riparian owners of land lying on the Chipola River above the Chipola Cutoff and below the Dead Lakes, the economic consequences of removing the dam would all be good. Jim Bozeman lives on the bank of the Chipola Cutoff 4.5 miles downriver from the dam on the site where his father has a public boat landing. Still further downriver are two other major businesses of this kind. With installation of the

dam closing off the Dead Lakes, the Bozemans' business, which includes renting boats and motors as well as launching others' boats, fell off. Removal of the dam should have the opposite effect.

Ten fish camp properties have docks or ramps on the Dead Lakes between the dam and Cypress Creek, as do 41 or 42 private landowners. Land upriver from Cypress Creek fronts the river channel, and lies beyond the influence of the dam. If the dam is removed, these property owners will have to extend their docks in order to have access to the water year round. In some cases, extending boat ramps may be an alternative.

There is a statutory exemption from permitting requirements for private docks of up to 500 square feet. DER generally permits private docks no wider than six feet if they are built in T- and L- shapes, whatever their length. The environmental authorities do not favor excavating channels.

The remains or "skeletons" of early docks reflect adaptions to fluctuations in the level of the lakes of the magnitude likely to recur upon removal of the dam. There are multi-tier docks on the lakes today. Only a few inches of water at the end of a dock will allow access to the lakes by boat, although it may be impossible to use the motor close to the dock.

The prosperity of the fish camps depends more on the size of the fish population than on the length of the dock necessary to reach the fishing boats. William Setterich, who owns Stokes Fish Camp, which is located midway along the western shore of the Dead Lakes, wants to see the dam removed. It will mean more mud in front of his fish camp more of the time and he would have to spend some more money on the dock, but the prospect of better fishing would justify the investment.

## CONCLUSIONS OF LAW

When DER transmitted these cases to the Division of Administrative Hearings; on remand from the District Court of Appeal, First District, and in keeping with Section 120.57(1)(b)3., Florida Statutes, the Division of Administrative Hearings assumed jurisdiction over NWFWMD's pending application for a dredge and fill permit.

### Standing

Unless one or more of the petitioners or intervenors who object to issuance of a permit has standing to do so, DER's tentative, freeform conclusion, reflected in its notice of intent to issue the permit, must be given effect. *Agrico Chemical Co. v. Department of Environmental*

150

*Regulation,* 406 So.2d 478 (Fla. 2d DCA 1981), pet. rev. den. 415 So.2d 1359 and 1361 (Fla. 1982). Under the *Agrico* case and others, the test for standing is whether the evidence has shown that the parties will suffer sufficiently immediate injury in fact of a kind which falls within the zone of interests protected by applicable substantive law. *Boca Raton Mausoleum, Inc. v. State of Florida, Department of Banking and Finance,* No. BN-466 (Fla. 1st DCA; Aug. 19, 1987) (on reh.); *Village Park Mobile Home Association, Inc. v. State Department of Business Regulation, etc.,* 506 So.2d 426 (Fla. 1st DCA 1987).

NWFWMD, DER and Chipola Basin Group first contend that none of the riparian property owners have standing because "they are already experiencing the harm that would allegedly occur through the proposed agency action." Respondents' Joint Proposed Recommended Order, p. 32. In arguing that injury the petitioners have already suffered precludes standing, respondents are reiterating the very contention rejected by the District Court of Appeal when this case was before them. *Sullivan v. Northwest Florida Water Management District,* 490 So.2d 190 (Fla. 1st DCA 1986). On this point, the District Court's decision establishes the law of the case. The evidence was clear that the expanse of mud in front of the petitioners' property will be greater, when the lakes are low if the dam is removed, and that, without the dam, it would be impossible to keep the water level up by closing the gates to the drawdown structure. Prolongation and aggravation of petitioners' loss of navigational access is injury of sufficient immediacy to petitioners' substantial interests.

The substantive statute makes "the property of others" a relevant consideration, along with navigation and "recreational values . . . in the vicinity of the project." Section 403.918(2)(a), Florida Statutes (1985). Petitioners' interests fall within the zone of interests protected by these statutory criteria. Riparian rights, including navigational access, are part of the property rights petitioners, as owners of land fronting on the Dead Lakes, have. "Recreational values in the vicinity" is, in addition, a category that includes the relative ability and convenience with which recreational users, including petitioners and intervenors, can gain access to the Dead Lakes.

Economics *per se* are not the concern to which these statutory provisions are addressed. *Miller v. State, Department of Environmental Regulation,* 504 So.2d 1325, 1327 (Fla. 1st DCA 1987). But the fact that diminution of their rights also has economic implications should not render petitioners and intervenors ineligible to question proposed governmental action that will wreak significant environmental change to their property.

Respondents also contend, with respect to certain petitioners and intervenors, that the evidence does not demonstrate the harm of which they complain. But the evidence includes answers to interrogatories which NWFWMD propounded and offered at hearing. According to the uncontroverted evidence, all the named petitioners, except Raymond Drainville, will have, without the dam, navigational access problems of greater severity and duration than those they now experience. The same is true of the individual intervenors, except for Milton M. and Ralph M. Fisher.

## The Merits

Although NWFWMD acted under the authority of Chapter 84-380, Laws of Florida (1984), in filing the permit application at issue, neither NWFWMD nor any other party contends that Chapter 84-380, Laws of Florida (1984), in any way abrogates the general laws of Florida governing issuance of dredge and fill permits.

The parties agree that Section 403.918(1) and (2), Florida Statutes (1985) applies. It provides:

403.918 Criteria for granting or denying permits.—

(1) A permit may not be issued under ss. 403.91-403.929 unless the applicant provides the department with reasonable assurance that water quality standards will not be violated. The department, by rule, shall establish water quality criteria for wetlands within its jurisdiction, which criteria give appropriate recognition to the water quality of such wetlands in their natural state.

(2) A permit may not be issued under ss. 403.91-403.929 unless the applicant provides the department with reasonable assurance that the project is not contrary to the public interest. However, for a project which signicantly degrades or is within an Outstanding Florida Water, as provided by department rule, the applicant must provide reasonable assurance that the project will be clearly in the public interest.

(a) In determining whether a project is not contrary to the public interest, or is clearly in the public interest, the department shall consider and balance the following criteria:

1. Whether the project will adversely affect the public health, safety, or welfare or the property of others;

2. Whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

152

3. Whether the project will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

4. Whether the project will adversely affect the fishing or recreational values or marine productivity in the vicinity of the project;

5. Whether the project will be of a temporary or permanent nature;

6. Whether the project will adversely affect or will enhance significant historical and archaeological resources under the provisions of s. 267.061; and

7. The current condition and relative value of functions being performed by areas affected by the proposed activity.

(b) If the applicant is unable to otherwise meet the criteria set forth in the subsection, the department, in deciding to grant or deny a permit, shall consider measures proposed by or acceptable to the applicant to mitigate adverse effects which may be caused by the project. If the applicant is unable to meet water quality standards because existing ambient water quality does not meet standards, the department shall consider mitigation measures proposed by or acceptable to the applicant that cause net improvement of the water quality in the receiving body of water for those parameters which do not meet standards.

NWFWMD filed its permit application before October 1, 1984. See Rule 17-12.130(1), Florida Administrative Code. The parties have stipulated that Rule 17-4.290, Florida Administrative Code, controls. At issue are subsections (5) and (6). They provide:

(5) Before issuance of a permit under this section, a biological survey, ecological study, and hydrographic survey, if such hydrographic survey is deemed necessary by the Department, must be prepared by or under the supervision of the Department, which contains findings and recommendations with reference to the effects of the proposed activity. upon fish, wildlife or other natural resources. A less extensive biological survey and ecological study shall be prepared by the Department in evaluating short form applications submitted pursuant to Subsection 14-4.290(3), Florida Administrative Code. However, if deemed necessary, the department may require the applicant to conduct and submit a hydrographic survey.

(6) The Department shall not issue a permit unless the biological survey, ecological study and hydrographic survey, if any, together with information and studies provided by the applicant affirmatively show:

153

(a) that such activity will not interfere with the conservation of fish, marine and wildlife or other natural resources, to such an extent as to be contrary to the public interest, and will not result in the destruction of oyster beds, clam beds, or marine productivity,including, but not limited to, destruction of natural marine habitats, grass flats suitable as nursery or feeding grounds for marine life, and established marine soils suitable for producing plant growth of a type useful as nursery or feeding grounds for marine life or natural shoreline processes to such an extent as to be contrary to the public interest, and

(b) that the proposed project will not create a navigational hazard, or a serious impediment to navigation, or substantially alter or impede the natural flow of navigable waters, so as to be contrary to the public interest.

If the Dead Lakes are properly classified as an Outstanding Florida Water, NWFWMD has the burden to show not only that removal of the dam would not be contrary to the public interest, but must also give "reasonable assurance that the project will be clearly in the public interest." Section 403.918(2), Florida Statutes (1985).

### Outstanding Florida Water

NWFWMD argues that the Dead Lakes do not qualify as an Outstanding Florida Water. In NWFWMD's view, the Chipola River is an Outstanding Florida Water upriver and downriver of the Dead Lakes, but is not an Outstanding Florida Water where it is called the Dead Lakes, except for that part of the Dead Lakes that lies within the Dead Lakes Recreational Area. The better view, however, which DER as well as the applicants espouse, is that the Dead Lakes are an integral part of the Chipola River for water quality purposes, and included as an Outstanding Florida Water, within the intendment of the rule. Rule 17-3.041(4)(c) and (g), Florida Administrative Code.

As Outstanding Florida Waters, the Dead Lakes have the special protection afforded by Rule 17-4.242, Florida Administrative Code. In part, the rule provides:

17-4.242 Special Protection: Outstanding Florida Waters; Equitable Abatement.

(1) Outstanding Florida Waters

(a) No Department permit or water quality certification shall be issued for any stationary installation which significantly degrades, either alone or in combination with other stationary installations, or

is within Outstanding Florida Waters, unless the applicant affirmatively demonstrates that:

. . .

(2) The proposed activity or discharge is clearly in the public interest, and either

a. A Department permit for the activity has been issued or an application for such permit was complete on the effective date of the Outstanding Florida Water designation; or

b. The existing ambient water quality within Outstanding Florida Waters will not be lowered as a result of the proposed activity or discharge, except on a temporary basis during construction for a period not to exceed thirty days; lowered water quality would occur only within a restricted mixing zone approved by the Department; and water quality criteria would not be violated outside the restricted mixing zone. Provided, however, that the Department may allow an extension of the thirty day time limit on a construction-caused degradation for a period demonstrated by the applicant to be unavoidable and where suitable management practices and technology approved by the Department are employed to minimize such degradation.

In accordance with the parties' prehearing stipulation, and by the prehearing order entered after the parties made their positions known at the prehearing conference, water quality issues have been limited to those involving dissolved oxygen eutrophication, turbidity and heavy metals. See generally *Florida Department of Transportation v. J.W.C. Co., Inc.,* 396 So.2d 778 (Fla. 1st DCA 1981). The pertinent rule criteria are:

(7) Biological Integrity—the Shannon-Weaver diversity index of benthic macroinvertebrates shall not be reduced to less than 75 percent of established background levels as measured using organisms retained by a U.S. Standard No. 30 sieve and, in predominantly fresh waters, collected and composited from a minimum of three Hester-Dendy type artificial substrate samplers of 0.10 to 0.15 m2 area each, incubated for a period of four weeks; and, in predominantly marine waters, collected and composited from a minimum of three natural substrate samples, taken with Ponar type samplers with minimum sampling area of 225 square centimeters.

. . .

(9) Cadmium—shall not exceed 5.0 micrograms per liter in predominantly marine waters; shall not exceed 0.8 micrograms per liter

in predominantly fresh waters in water with a hardness (in milligrams per liter of CaCo3) of less than 150, and shall not exceed 1.2 micrograms per liter in harder waters.

. . .

(13) Dissolved Oxygen—in predominantly fresh waters, the concentration shall not be less than 5 milligrams per liter. In predominantly marine waters, the concentration shall not average less than 5 milligrams per liter in a 24-hour period and shall never be less than 4 milligrams per liter. Normal daily and seasonal fluctuations above these levels shall be maintained in both predominantly fresh waters and predominantly marine waters.

. . .

(16) Lead—shall not exceed .03 milligrams per liter in predominantly fresh water.

(17) Mercury—shall not exceed 0.1 micrograms per liter predominantly marine waters; shall not exceed 0.2 micrograms per liter in predominantly fresh waters.

(18) Nickel—shall not exceed 0.1 milligrams per liter.

(19) Nutrients—In no case shall nutrient concentrations of a body of water be altered so as to cause an imbalance in natural populations of aquatic flora or fauna.

The evidence the applicant adduced here gives reasonable assurances that removal of the dam will enhance "biological integrity," in the sense of contributing to an environment in which more species can live. NWFWMD has also given reasonable assurances that concentrations of dissolved oxygen in the Dead Lakes will increase with removal of the dam.

The record affords no realistic basis for fears that contamination from the Sapp site will reach the estuary, if the dam is removed, except for contamination bound up in sediment which would have moved downriver even with the dam in place. Although not insulated from other sources of heavy metal contamination, the Dead Lakes, which are spring fed and drain less area than the Apalachicola River, should, with the dam removed, have more of a diluting effect at times of low flow, as the Chipola River enters the Chipola Cutoff.

Removal of the dam will undoubtedly create temporarily turbid conditions in the vicinity, but "ambient water quality within Outstanding Florida Waters will not be lowered as a result of the proposed

156

activity . . . except on a temporary basis during construction. . . ." Rule 17-4.242(2)b., Florida Administrative Code. Just how long removing the dam would take is not clear from the record; the 30 day limit normally applicable may be extended if "unavoidable," and if "suitable management practices and technology" are employed. Even without turbidity screens, removal of the dam would not be likely to muddy the water so much that it was not a good deal less muddy than the Chipola Cutoff by the time it flowed into the Cutoff.

Removal of the dam will have long-term as well as short-term effects. As far as the record reveals, the project will neither adversely affect nor enhance significant historical or archaeological resources. Taking the dam out would improve navigation and the flow of water and reduce shoaling and, around the drawdown structure, erosion. During low flows it would be even harder for most waterfront property owners to gain access to the water, however. This is a detriment which is not less serious for the economic hardship the property owners would suffer. On the other hand, the owners of waterfront property would eventually have better fishing, which would not be less enjoyable for the economic benefit that would confer.

On the whole, removal of the dam will enhance the public safety, and affect the conservation of fish and wildlife, including endangered or threatened species, and their habitat, favorably. Except for temporary turbidity, the water quality consequences of removing the dam will probably all be favorable. Alteration of the hydroperiod will change the nature and duration of some habitat in a way that will increase the diversity of flora and fauna in areas affected by the project.

It is, accordingly,

RECOMMENDED:

1. That petitioner Raymond Drainville and intervenors Milton M. Fisher and Ralph A. Fisher be dismissed as parties.

2. That the Department of Environmental Regulation grant NWFWMD's application for a permit to remove the Dead Lakes Dam, on the conditions stated in the notice of intent.

DONE and ENTERED this 31st day of August, 1987, in Tallahassee, Florida.